Filed 6/30/21  P. v. Nguyen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br> v.<br><br>LINH THY NGUYEN,<br><br> Defendant and Appellant. | G060136<br><br>(Super. Ct. No. C1642691)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Santa Clara County, David A. Cena, Judge.  Affirmed.

Riordan & Horgan and Dennis Riordan; Marc. J. Zilversmit for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

In 2018, appellant Linh Thy Nguyen was tried on charges he committed multiple child sex crimes against his wife's cousins between 1997 and 2005. Due to the lengthy delay between the commission of appellant's alleged crimes and the commencement of his trial, the victims' testimony was "generic" in the sense they were unable to recall the specific dates and some of the particular occasions on which the charged acts occurred. (See *People v. Jones* (1990) 51 Cal.3d 294, 299 (*Jones*).) Despite this – and despite appellant's steadfast denial of any wrongdoing – the jury convicted him on all of the charges.

Appellant contends reversal is required because 1) the precharging delay and lack of specificity in the charges violated his due process rights, 2) there is insufficient evidence to support the verdict in multiple respects, 3) the prosecutor committed prejudicial misconduct during questioning and closing argument, 4) the trial court erroneously admitted evidence of uncharged misconduct, 5) his attorney was ineffective for failing to present certain exculpatory evidence, and 6) the cumulative effect of these errors and deficiencies rendered his trial fundamentally unfair. Finding these contentions unmeritorious, we affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1985, appellant and his family immigrated to the United States from Vietnam and took up residence in San Jose. Eight years later, at the age of twenty-four, appellant started dating sixteen-year-old Tran D. Although Tran and appellant were never legally married, they did go through a Vietnamese marriage ceremony in 1998 and have a daughter together the following year. It was around this time that appellant started molesting Tran's cousins Thanh, Thuy, Phoung and Phi.

Thanh and Thuy are sisters. In 1994, when Thanh was three years old, she and her parents immigrated from Vietnam to San Jose, where Thuy was born two years later. Phoung and Phi are also sisters, and like Thanh, they too were born in Vietnam.

They were 14 and 7 years old, respectively, when they immigrated to San Jose with their parents in 1998.

When Thanh's family first arrived in San Jose, they lived with Tran and her mother Lieu at their Foxdale Village Apartment (Foxdale apartment) for several years, from around 1994 to 2001. Phoung and Phi also spent time at the apartment during this time, as did appellant. As Tran's boyfriend and future husband, he became acquainted with the victims through family gatherings and other visits to the apartment.

During one such visit, when Thanh was about seven years old, she and appellant were in the living room, and her parents and Lieu were in the adjacent dining room area. Appellant was sitting on the couch, largely out of view of the other adults, when he picked up Thanh and put her on his lap. Then he put a blanket over himself and Thanh, wrapped his arm around the little girl, and reached down and began fondling her crotch. First, he rubbed his hand over her clothing. Then he reached underneath her pants and underwear and touched the outer part of her vagina. This made Thanh feel uncomfortable and scared, but she did not call out for help. Instead, she squirmed around anxiously on appellant's lap until he removed his hand, and then she ran off without saying a word to anyone about the incident.

The following year, Thanh had an even more harrowing encounter with appellant at the Foxdale apartment. One day after school, he beckoned her into Tran's bedroom, closed the door and told her to lay down on the bed and take off her clothes. Not knowing what was going on, Thanh reacted very slowly. Once she got on the bed, she either took off her pants herself, or appellant did it for her because she was not doing it fast enough. He then removed her underwear and put his mouth on her vagina, which made Thanh feel scared and confused. After he stopped, Thanh got up and redressed. But as she was walking toward the door, appellant blocked her path, took out his penis and told her to open her mouth. When Than refused, he grabbed the back of her head and

3

pressed his penis against her closed lips before finally relenting and letting her leave the room.

About a year later, in 2001, Lieu and Tran moved to a new home, not far away on Schooner Court (the Schooner house), and Thanh and her family moved to a mobile park in San Jose. However, Thanh continued to see appellant from time to time. In 2002, she and her family took a trip to Reno with Lieu, Tran and appellant. They all stayed in the same hotel room, with Thanh, Tran and appellant sleeping side by side on the floor. Early one morning, while everyone else was still asleep, appellant reached over Tran and began touching Thanh's butt until she woke up. Thanh was too afraid to say anything. She just tried to scoot farther away from appellant on the floor. However, he kept his hand on her backside and continued to feel her butt until she was finally able to get outside his reach.

At trial, Thanh testified that while she has a very strong sense he molested her on other occasions as well, she does not remember any other specific incidents during which appellant touched her inappropriately. Because she was only a child when the molestation occurred, she never thought about questioning appellant's authority. As part of the Vietnamese culture, she was taught to obey her elders, and if they told her to do something, she would usually do it in a "very robotic" fashion, so as to avoid appearing disrespectful.

Around the same time appellant was molesting Thanh, he was also molesting her cousin Phi, who is the same age as Thanh. Appellant had access to Phi because after her family moved to San Jose in 1998, her parents would drop her off at the Foxdale apartment on Saturdays. She would spend the day playing with Thanh and Thuy, and then her parents would typically join them at the apartment for dinner in the evening with Lieu and other relatives. Phi also went over to the apartment on Sundays and after school during the week sometimes.

4

On many of her visits to the apartment, appellant was also there. Oftentimes, he would lure Phi into Tran's bedroom by telling her he needed to show her something. Then he would start feeling her body and putting his hands inside her pants. Sometimes, he would have Phi lay down on the bed, which was just a box spring and mattress on the floor. While asking Phi questions about how she was doing in school, and if she wanted to go to Disneyland, he would then pull down her pants and touch her genitals.

Asked to explain how appellant had her lay down on the bed, Phi said he would push her down slowly and then take off all her clothes. While he was doing so, he would often tell Phi he was a doctor and was just examining her. In addition to touching the outer part of Phi's vagina, he also put his mouth on her vagina sometimes. This terrified Phi. However, eventually she would work up the courage to "push away" from appellant and find some excuse to leave the room. Although she wasn't sure exactly how many times appellant molested her in this fashion at the Foxdale apartment, she testified he both touched and licked her vagina more than six times at that location.

To Phi's great dismay, the molestation continued after Lieu moved to the Schooner house in 2001. The incidents played out basically the same way there, with appellant luring Phi into a bedroom and proceeding to touch and lick her vagina. He also stuck his tongue down her throat once.

The final episode occurred in the living room of the Schooner house. Phi entered the room to find appellant sitting on the couch. He started lecturing her about how important it was to do well in school, and then he grabbed her hand and put it on his penis, over his pants. After a second or so, Phi pulled her hand away and walked out of the room.

According to Phi, appellant never caused her pain or explicitly threatened her during any of these incidents. However, like Thanh, Phi thought of appellant as an elder whom she had to respect and obey. That dynamic was heightened by the fact

5

appellant was twice her size, and he was often the only adult in the house or apartment at the time he was molesting her.  Indeed, Phi testified that was the case during most of the incidents at the Schooner house.  On those occasions, she had a lingering fear appellant was going to harm her.

In addition to molesting Phi and Thanh, appellant also victimized Thanh's younger sister Thuy.  Thuy recalled that when she was about seven years old, she would go over to the Schooner house roughly twice a month with Thanh.  On three or four of those occasions, she encountered appellant "on a hammock" in the living room.[1]  He told her to stick out her tongue, and when she did, he got right up in her face and sucked on her tongue.  Thuy knew this was wrong, but since appellant was her elder, she felt she had to do what he said.

By and large, there were no independent witnesses to the sexual abuse appellant perpetrated on Thanh, Phi and Thuy.  However, sometime around 2004, Phi saw the tail end of a suspicious encounter between Thanh and appellant at the Schooner house.  Upon looking into one of the bedrooms, Phi saw Thanh sitting on the bed with appellant standing right next to her, zipping up his pants.  Hoping she wasn't too late to prevent Thanh from being molested, Phi made a loud noise outside the room.  But when Thanh came out of the room, she told Phi that appellant had put his penis in her mouth.  Phi told Thanh that appellant had been molesting her, too.  She advised Thanh to avoid being in the same room as appellant.

As it turned out, there was another incident that occurred around this time that put an end to appellant's abusive behavior altogether.  Phi and Thanh were watching a movie upstairs at the Schooner house when Thuy came into their room crying and upset.  Asked what was wrong, Thuy said appellant had sucked on her tongue after he had told her to stick it out.  This made Thanh and Phi very mad.  Seeing Thuy in such

---

[1]     It is unclear from Thuy's testimony whether she was on the hammock, appellant was on the hammock, or both of them were.

6

distress, and knowing what appellant had done to them personally, they decided it was time to confront him about the situation.

They marched downstairs and told appellant they were sick of him molesting them and Thuy, and if he kept it up, they were going to call the police. Appellant was both surprised and concerned to be confronted so directly. While he insisted the whole thing was just a big misunderstanding, and he had just been playing around, he apologized and promised never to come near the girls again if they agreed not to report him to the police. Thanh and Phi agreed and even shook appellant's hand to seal the deal. After that, appellant never harmed Thanh, Phi or Thuy again.

However, the weight of the matter wore heavily on their consciences. Eventually, Phi told her parents appellant had touched her inappropriately, but they did not act on this information. And when Thanh was 16 years old, in 2007, she revealed to her boyfriend that appellant had sexually abused her when she was younger.

She also told her high school history teacher, Mr. Elves, about the abuse. That disclosure occurred after Thanh read a book about human trafficking that stirred up a lot of memories and emotions in her. Elves told Thanh that, as a teacher, he had to report her allegations, but Thanh was not contacted by the police at that time. Instead, she simply received counseling at her school.

Thanh had further counseling for the issue while she was in college. However, it wasn't until June 2014, at the age of 23, that she finally reported appellant to the police. At the time, Thanh was interviewed by an officer from the San Jose Police Department (SJPD). She also gave a follow-up interview to investigators approximately two years later, in April 2016.

Three months after that, in July 2016, appellant was charged in a six-count felony complaint with sexually abusing Thanh and Phi. The complaint was amended a year later to add charges for crimes appellant committed against Thuy. And following

7

the preliminary hearing, the People filed an information charging appellant with a total of 18 separate offenses.

During trial, the prosecution amended the information to conform to proof by slightly altering the commission dates of the charged offenses. Roughly speaking, the three crimes against Thanh were alleged to have occurred between 1997 and 2001, the twelve crimes against Phi were alleged to have occurred between 1998 and 2003, and the three crimes against Thuy were alleged to have occurred between 2002 and 2005. However, none of the particular crimes was alleged to have a time frame for commission that was greater than three years.

At trial, Thanh, Phi and Thuy testified to the abuse they suffered at the hands of appellant. Because they described a greater number of acts than the number of crimes appellant was accused of committing, the jury was instructed it must either unanimously agree as to the specific act that constituted each offense, or unanimously agree appellant committed all of the acts alleged to have occurred during the relevant time period for each offense.

In addition to the victims' testimony, the prosecution also presented testimony from Phi's sister Phoung (aka Arie) to prove appellant had a propensity to commit the charged offenses. Phoung testified that when she was 14 years old, she usually went over to the Foxdale apartment on weekday evenings after tennis practice. On those occasions when appellant was also at the apartment, he usually did not talk to her that much. But one day, when she was in her tennis outfit, he told her she was getting heavy and asked how much she weighed. When Phoung said she didn't know, appellant said, "Let me weigh you." He then came up to her from behind, wrapped his arms around her, and lifted her up for a few seconds.

Phoung thought this was very peculiar. But before she could say anything, appellant told her, "Let me do it again, you feel heavier that I thought." This time when he lifted Phoung from behind, he grabbed her breasts and moved his hands around on

8

them, which made Phoung feel even more uncomfortable. Unhappy that appellant was essentially lifting her up by her breasts, she said "this is enough," pushed him away and left the room.

After that, Phoung never had any more problems with appellant. However, one day later that school year, she walked into Tran's bedroom and saw appellant kneeling on top of Thanh on the mattress. When Phoung asked appellant what was going on, he pulled away from Thanh very quickly and exited the room. Phoung then asked Thanh what happened, but Thanh, who was seven years old at the time, did not want to talk about it. Later, Phoung tried to warn Tran that there was something wrong with her boyfriend, i.e., appellant, but Tran paid no attention. Consequently, Phoung did not tell her parents about appellant's behavior. Given Tran's dismissive attitude, and because her cultural heritage told her it was a sign of weakness to express one's emotions, Phoung decided to just keep quiet about the situation.

As noted, Thanh, Phi and Thuy were also largely silent about appellant's predatory behavior for many years. At trial, the prosecution called an expert witness on Child Sexual Abuse Accommodation Syndrome to help the jury understand why child sex abuse victims are often reluctant to disclose their suffering to others. He said most victims feel too ashamed and powerless to report their abusers. And if they are subjected to ongoing abuse, it may be hard for them to remember many details about the circumstances under which it occurred because children do not have a good sense of time, relativity or sequential ordering. They may collapse the abuse into a single memory or only remember the worst things that happened to them. Yet, they will still have a general awareness that they were abused on an ongoing basis over a substantial period of time.

The defense case consisted of 15 witnesses, many of whom are related to appellant. They testified appellant has a good character, and they never saw him act inappropriately around children. Tran was one of those witnesses. She said that after

9

their wedding ceremony in 1998, she and appellant rarely went to the Foxdale apartment or the Schooner house, and therefore appellant and the victims spent very little time together. In fact, she said appellant worked every weekend, so he often missed family gatherings and such. Recalling the Reno outing on which appellant allegedly touched Thanh's butt while they were sleeping on the floor, Tran said that was not possible because she and appellant slept together in a bed during that trip.

Although their relationship did not last, and they separated in 2006, Tran said she and appellant remained on good terms with each other, even though they both remarried. Tran was so confident in appellant's moral character that when she was hospitalized for brain cancer in 2011, she told appellant she wanted him to have custody of their daughter Stella if her cancer proved fatal.

Tran's mother Lieu, described as the patriarch of the family, also testified on appellant's behalf. Like Tran, she minimized the amount of time that appellant spent with the victims, saying he only came over to her place "from time to time." She also admitted that when Tran was sick with cancer in 2011, she (Lieu) wanted to get custody of Stella if Tran didn't pull through. According to Lieu, this had nothing to do with appellant's fitness as a father. She just thought Stella would be better off living with her (which is where Stella had spent much of her time since her parents separated) than with appellant and his new family. Lieu testified she never actually told this to appellant. She also said insisted she never badmouthed appellant to other people or said he was not good enough for her daughter Tran.

Appellant testified to the contrary. He told the jury that Lieu never liked him and that she constantly criticized and belittled him in front of others, including the victims.[2] Appellant further claimed that Lieu spread false rumors he was having an affair after he refused to go to Vietnam and marry one of Lieu's relatives so that she could

---

[2] One of appellant's sisters and one of his long-time friends also testified that Lieu was often very critical of appellant.

10

come and live in the United States. According to appellant, it was Lieu's intense hatred of him that motivated the victims to falsely accuse him of the charged offenses. He surmised the victims were beholden to Lieu because she was good to them and their families. And after hearing Lieu badmouth him year in and year out while they were growing up, they fabricated the molestation allegations so that if anything ever happened to Tran, Lieu would get custody of Stella, not him. However, for the most part, Thanh, Phi and Thuy testified they never heard Lieu badmouth appellant, and Tran testified she didn't either.

During his testimony, appellant also maintained he had virtually no opportunity to molest any of the alleged victims because, starting in 1999, he worked long hours at various car dealerships and never had a weekend off. When he went to the Foxdale apartment or the Schooner house on the weekend, he would always arrive late and rarely see the victims.[3] Appellant did admit he sometimes saw the victims when he went to Lieu's place during the week, but he insisted he was never alone with them or mistreated them in any way.

The jury did not believe this. After sitting through a week's worth of testimony, it convicted appellant on all charges after deliberating for less than four hours. In particular, it found appellant guilty of ten counts of forcible lewd conduct on a child under the age of fourteen. (Pen. Code, § 288, subd. (b)(1).)[4] One of those counts involved Thanh, three involved Thuy, and the rest involved Phi. The jury also found appellant guilty of eight counts of aggravated sexual assault on a child under the age of fourteen for forcibly orally copulating Thanh on two occasions and doing the same to Phi on six occasions. (§§ 269, subd. (a)(4), 288a, subd. (c)(2)(B).) In addition, the jury

---

[3] Appellant subpoenaed work records from his employers in order to corroborate his claim that he always worked late on weekends. However, only the records from the last three years before trial were available. The rest had been destroyed pursuant to the employers' general recordkeeping policy.

[4] Unless noted otherwise, all further statutory references are to the Penal Code.

found true allegations appellant committed his crimes against multiple victims for purposes of the One Strike sentencing law. (§ 667.61, subds. (b), (e)(4).)

Following the verdict, appellant replaced his trial attorney with his current lawyer, Marc J. Zilversmit. Mr. Zilversmit filed a voluminous motion for a new trial that raised all of the claims that are presented in this appeal. The trial court denied the motion, finding ample evidence to support the verdict, and no violation of appellant's constitutional rights. It then sentenced appellant to the statutorily mandated term of 270 years to life in prison for his crimes.

## III. DISCUSSION

### A. *Precharging Delay and Specificity of the Charges*

Appellant contends his prosecution violated two fundamental tenets of due process, the right to be charged without undue delay, and the right to adequate notice of the charges. Although the precharging delay was lengthy in this case, and the accusatory pleadings did not specify the exact dates on which the charged offenses allegedly occurred, we find no violation of appellant's due process rights.

### 1. *Applicable Legal Principles*

The United States Constitution has two provisions governing prosecutorial delay. In addition to the Sixth Amendment's command that the accused be afforded a speedy trial, which protects against excessive postcharging delay, the due process clause of the Fifth Amendment protects against excessive precharging delay. (*United States v. Lovasco* (1977) 431 U.S. 783, 789-790; *People v. Booth* (2016) 3 Cal.App.5th 1284, 1302.) Appellant's claim is grounded in due process and focuses on the delay that occurred between the time of his alleged offenses and the time he was formally charged with committing them.

"To establish a due process violation, the defendant must prove the existence of actual harm, 'such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time.' [Citations.] 'If the

12

defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. [Citation.]' [Citation.] 'The balancing task is a delicate one, "a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. [Conversely], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal." [Citation.]' [Citation.] At bottom, the court must ascertain whether the precharging delay tilted the playing field against the defendant in such a way that it prevented him from receiving a fair trial. [Citations.]" (*People v. Booth, supra,* 3 Cal.App.5th at pp. 1302-1303.)

The right to fair notice of the charges also emanates from the due process clause. Indeed, "[o]ne of the most fundamental requirements of due process is that an individual must receive adequate notice of the charges or claims being asserted against him." (*United States v. Baker* (6th Cir. 1986) 807 F.2d 1315, 1323.) "'"A criminal defendant must be given fair notice of the charges . . . in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial."' [Citation.]" (*People v. Anderson* (2020) 9 Cal.5th 946, 953.) Proper notice also allows the defendant to make informed decisions about whether to plead guilty and how to allocate investigatory resources before trial. (*Id.* at p. 964.)

With these principles in mind, we must determine whether the charges in this case were filed with sufficient celerity and specificity to protect appellant's due process rights.[5]

---

[5] Respondent claims appellant forfeited his right to raise his due process arguments on appeal because he did not raise them before trial. However, appellant did raise them after trial, in his motion for a new trial. This permitted the trial court to assess appellant's arguments and possible prejudice in light of the actual evidence that was adduced at trial. (See *People v. Price* (1985) 165 Cal.App.3d 536, 542.) It also afforded the prosecution ample opportunity to respond to appellant's arguments, which it did in lengthy briefing. Because appellant's arguments received fair and full consideration in the trial court, respondent's forfeiture claim is not well taken.

## 2. *Precharging Delay*

The relevant dates and events surrounding appellant's claim of undue precharging delay are set forth in the following timeline:

1997 to 2005:  General time frame of alleged offenses

June 16, 2014:  Thanh reports appellant to the police

April 15, 2016:  Thanh is re-interviewed by investigators

July 21, 2016:  Complaint

May 10, 2017:  Phi and Thuy are interviewed by investigators

June 7, 2017:  First amended complaint

July 26, 2017:  Preliminary hearing

Aug. 1, 2017:  Information

Feb. 26, 2018:  Trial starts

March 1, 2018:  First amended information

March 6, 2018:  Verdict

This timeline shows the prosecution did not commence charges against appellant until 2016, roughly 19 years after his first alleged offense took place.  However, Thanh did not report appellant to the police until 2014.  Thus, the relevant period of precharging delay is only two years, not two decades.

Appellant disagrees.  In his view, the prosecution had sufficient notice to commence charges in 2007, when Thanh told her high school teacher Mr. Elves that she had been sexually abused and she received counseling for such abuse.  Although Thanh testified she was not contacted by the police at that time, appellant contends that is immaterial because Elves and the counselor were statutorily required to report Thanh's allegations to the police.  (See § 11166.)  As appellant puts it, "The failure of Elves and [the counselor] – both mandatory reporters – to report Thanh's allegations or, if they were reported [], the failure of law enforcement to proceed on those allegations at that

14

time, was without legal or factual justification. It was in the interest of both the prosecution and the defense to address those allegations in 2007 rather than later[.]"

The problem with this argument is that it presumes the state is required to file criminal charges whenever it receives information about a potential crime. That is not the law. (*United States v. Lovasco, supra,* 431 U.S. at p. 791.) In fact, imposing such a requirement would result in premature prosecutions that would be detrimental to both the state and the accused. (*Id.* at pp. 790–796.) Because of this, and because investigating criminal activity is often a highly complex endeavor, prosecutors have "broad discretion when it comes to deciding how to allocate scarce investigative resources and when to file criminal charges in a particular case. [Citations.]" (*People v. Booth, supra*, 3 Cal.App.5th at p. 1303.) "Simple wisdom and a due regard for the separation of powers doctrine allows for no other rule." (*People v. Boysen* (2007) 152 Cal.App.4th 1409, 1422.)

With respect to the investigation in this case, the record does not disclose what, if anything, the police and/or prosecutors actually knew about Thanh's allegations back in 2007, when she told Elves about her abuse. Accordingly, we cannot fault them for failing to initiate criminal proceedings against appellant at that time. The fact that a teacher knew about the crime does not start the state's clock running.

Appellant also complains about the two- to three-year delay that occurred from the time Thanh initially reported her abuse to the SJPD in 2014 until the time the original complaint was filed in 2016, and the amended complaint was filed in 2017. At trial, veteran police officer Michael Wharton spoke to that delay. Wharton is an investigator with the Santa Clara District Attorney's Office. He testified he was brought onto the case in 2017 to interview Phi and Thuy because the SJPD, where Wharton had previously worked for 22 years, needed assistance on the case.

Wharton described his job as an investigator with the District Attorney's office as being like a "janitor" who cleans up "messes that . . . police officers have left

15

behind in their cases." However, Wharton did not impugn the efforts of the SJPD in this particular case. In the department's defense, he said the sexual assault division of the SJPD is the busiest unit in the entire department, and the investigators who work there have very demanding caseloads. He also explained that cases are prioritized according to the seriousness of the allegations and the likelihood of the accused committing additional sex crimes. That means the highest priority is given to cases in which the accused poses a clear and present danger to the victim.

In light of Wharton's testimony, it is understandable that appellant's case was not given greater priority. When Thanh reported him to the SJPD in 2014, he was not a current threat to her. As a matter of fact, it had been over a decade since he last molested Thanh, Phi or Thuy. While every allegation of child sexual abuse deserves prompt and careful consideration, the nature of the victims' claims did not warrant urgent action in this case.

In any event, many years had already passed from the time appellant sexually abused the victims until the time Thanh reported him to the police. Under these circumstances, it is hard to see how appellant was prejudiced by the additional two- to three-year delay that occurred prior to the time he was formally charged. We recognize that delay may have contributed to the victims' inability to remember more precisely when it was that appellant molested them, and that it is often difficult to establish an alibi defense when the exact dates of the charged offenses are unknown. However, Phi testified appellant molested her virtually every Saturday during the period in question, which provided fertile ground for appellant's alibi defense.

In furtherance of that defense, appellant testified he always had to work on the weekends, and he called two of his former coworkers to corroborate that claim. Due to the passage of time, appellant was unable to obtain his actual work records to provide further proof of his work schedule. But since those records were only kept for three

16

years, they would not have been available to him even if he had been charged a few years earlier than he was. (See *ante*, p. 11, fn. 3.)

All things considered, we do not believe the lengthy precharging delay in this case violated appellant's due process rights. At most, only two to three years of that delay was attributable to the prosecution, and the resulting prejudice from that delay was negligible at best. Therefore, the delay is not cause for reversal.

Appellant's complaint of unfairness in the timing of this case is more accurately directed at the legislature's decisions regarding the statute of limitations in such offenses. But as he implicitly concedes, we have no control over that, and he has no way of overturning those decisions.

### 3. *Charging Specificity*

Appellant contends the lack of specificity in the accusatory pleadings as to when the alleged offenses occurred violated his right to fair notice of the charges. We cannot agree.

Our analysis is guided by the California Supreme Court's decision in *People v. Jones, supra,* 51 Cal.3d 294. In that case, the court ruled that in child molestation prosecutions, due process does not require notice of the specific time or place of the charged offenses, so long as they occurred within the applicable limitation period. (*Id.* at p. 317.)[6] Greater specificity is not required for two reasons. First, child sexual abuses cases often (and unavoidably) involve "generic" testimony that is devoid of "details, dates or distinguishing characteristics as to the individual acts or assaults." (*Id.* at p. 299.) And, second, the preliminary hearing, demurrer and discovery are available to the defense to flesh out the factual basis for the allegations. (*Id.* at p. 318.) The victim must still be able to describe the kind and number of acts committed, as well as the general time period in which the acts occurred (*id.* at p. 316), but "the prosecution of

---

[6] Appellant does not dispute that all of the charges against him were timely filed for purposes of the applicable statute of limitations.

17

child molestation charges based on [such] generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him." (*Id.* at p. 318.)

Appellant contends *Jones* is not controlling here because it involved a resident child molester who did not raise an alibi defense, the complaint in that case was filed within two years of the alleged offenses, and the time frame for their alleged commission was two months, not two to three years. He also points out that the statute of limitations for child sex crimes is longer now than it was at the time *Jones* was decided.

We do not believe these factors materially distinguish *Jones* from our case or undermine the continued validity of that decision. Despite the unavailability of an alibi defense in *Jones*, the court made it clear its ruling had broad societal significance and was not limited to the particular circumstances presented in that case. (*Jones, supra*, 51 Cal.3d at p. 300.) And there is nothing in the opinion to suggest it was not intended to apply in cases involving greater charging delays, broader time frames or longer statutes of limitations. It was clearly intended to set out broad guidelines for a large class of cases.

Appellant complains the pretrial discovery he received failed to shed light on important details concerning the charged offenses, such as when, exactly, they occurred. However, appellant did not demur to the charges on that, or any other, basis. Nor did he take advantage of the preliminary hearing to glean more information about the charges. At that hearing, defense counsel had ample opportunity to question the victims regarding the circumstances and time frame of appellant's alleged crimes. But instead of exploring those topics, counsel questioned the victims about the circumstances under which they reported appellant's crimes to the police. Appellant's lack-of-notice complaint does not ring true given his failure to avail himself of the tools available for obtaining further information about the charges.

The claim is also damaged by the fact that even if the exact date of every alleged offenses had been known and charged, it is exceedingly unlikely appellant would have been able to account for his whereabouts on each of those specific dates. Thus, from a practical standpoint, greater specificity in the charges would not have enabled appellant to establish an airtight alibi for all of the alleged crimes. However, as we have explained, Phi's testimony that appellant molested her virtually every Saturday provided the defense a workable time frame around which it was able to fashion a plausible alibi defense.[7] That enabled it to raise the same questions about the charges that would have been raised had a number of specific dates been vulnerable to attack. Under the circumstances presented, that was the best appellant could hope for. We do not believe the lack of specificity in the charging documents violated his due process rights.

B. *Sufficiency of the Evidence*

Appellant raises three separate arguments related to the sufficiency of the evidence to support his convictions. First, there is insufficient evidence to support the jury's findings he used force or duress against the victims. Second, that evidentiary deficiency was compounded by the prosecution's misstatements in closing argument about what constitutes duress. And third, his conviction on several of the counts cannot stand because they were not proven at trial or the preliminary hearing. We find these arguments unavailing.

1. *Standard of Review*

As set forth in the *Jones* decision, "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably

---

[7] Phi testified to that effect at both the preliminary hearing and at trial.

19

deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*Jones, supra*, 51 Cal.3d at p. 314.)

### 2. *Evidence of Force or Duress*

Appellant was convicted of two types of forcible sex crimes, lewd conduct in the form of touching, and aggravated assault in the form of oral copulation. With respect to both offenses, the prosecution had to prove that, in carrying out the proscribed act, appellant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury against the victims. (§§ 288, subd. (b)(1) [forcible lewd conduct], 269, subd. (a)(4) [defining aggravated sexual assault to include forcible oral copulation under § 288a, subd. (c)(2)(B)].) At issue here are the elements of force and duress.

The force element is satisfied when the defendant uses force that is "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 242 (*Soto*).) That can be holding or restraining the victim or using any force that is "'different from and in excess of the type of force which is used in accomplishing similar lewd acts with a victim's consent.' [Citation.]" (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004–1005.)

Duress, on the other hand, involves psychological coercion. (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) Duress occurs when the defendant makes "'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one

20

otherwise would not have submitted.' [Citation.]" (*Ibid*.) Factors bearing on the issue of duress include "the relationship between the defendant and the victim and their relative ages and sizes. [Citation.] 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress. [Citation.]" (*Ibid*.; accord, *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50-51, disapproved on other grounds in *Soto, supra*, 51 Cal.4th at p. 248.)

The first time appellant sexually abused the victims, they were about seven years old, and he was pushing thirty. From a physical, emotional and psychological perspective, this alone created an "inherent imbalance of power" between the parties. (*Soto, supra,* 51 Cal.4th at pp. 245-246.) And although appellant was not a blood relative of the victims, he did marry their cousin Tran (at least in the eyes of the Vietnamese community) right around the time he started molesting them. For all intents and purposes, that made appellant a part of the victims' extended family. He was not somebody they could easily avoid or stand up to.

To the contrary, the victims each testified that, as part of the Vietnamese culture, they were brought up to respect and obey their elders. The fact they considered appellant to be an authority figure made them particularly vulnerable and susceptible to his commands. This dynamic was exacerbated by the fact that much of the abuse they endured took place in a secluded bedroom, or when appellant was the only adult in the house. That was not always the case when he molested the victims, but Phi testified, "[M]ost of the time . . . he was the only adult there; so I was scared that he was going to harm me."

Thanh also testified she was frightened when appellant abused her. However, given appellant's status as an elder, she said it was very difficult for her not to go along with what he told her to do. Thuy testified likewise. Asked why she always obeyed appellant's directive to stick out her tongue, she explained, "I just felt like . . . I

21

had to do it, like, I didn't feel like I had a choice or not." The fact Thuy continued to follow this command, even after appellant had already taken advantage of her by sucking on her tongue, demonstrates the tremendous amount of psychological power and control he had over the victims.

Appellant also utilized physical force to achieve his sexual objectives. When Thanh refused to open her mouth after he took out his penis and blocked her from leaving the bedroom, he grabbed the back of her head and pressed his penis against her lips. (See *People v. Pitmon, supra,* 170 Cal.App.3d at p. 48 [defendant's act of slightly pushing victim's hand back during lewd act was sufficient to satisfy force element], disapproved on other grounds in *Soto, supra*, 51 Cal.4th at p. 248].)[8] And when appellant molested Thanh in the living room the time before that, he lifted her onto his knee and wrapped his arm around her while feeling the outer part of her vagina.

In a similar vein, Phi testified that appellant pushed her down on the bed before molesting her and that she had to physically extract herself from his control – "push away" from him, as she described it – once he started molesting her. (See *People v. Babcock* (1993) 14 Cal.App.4th 383, 387 [the victim's resistance is a factor in assessing whether the defendant used force to accomplish the lewd act].) And the last time appellant molested Phi, he actually grabbed her hand and made her touch his penis over his pants. (See *People v. Morales* (2018) 29 Cal.App.5th 471, 480 ["'Acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force."]; *People v. Babcock, supra*, 14 Cal.App.4th at p. 386 [finding the force element satisfied where the defendant grabbed the victims' hands and made them to touch his genitals].)

---

[8] Appellant argues that since his penis did not go inside Thanh's mouth, his conduct only amounted to attempted oral copulation. However, "[o]ral copulation is defined as any contact, no matter how slight, between the mouth of one person and the sexual organ of another. Penetration is not required." (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 80.)

Viewing the facts in favor of the judgment below, there is sufficient evidence to support the jury's finding that appellant sexually abused the victims by means of force or duress. Although the victims were unable to remember every incident during which appellant molested them, they provided enough information about their relationship with appellant, and enough detail about the episodes they could recall, from which the jury could reasonably conclude appellant was guilty of all the charged offenses.

### 3. *Closing Argument Regarding the Meaning of Duress*

As part of his sufficiency-of-the-evidence argument, appellant also assails the prosecutor's closing remarks to the jury about what constitutes duress from a legal standpoint. The prosecutor said duress can be based on either a direct or implied threat: "It doesn't have to be, 'Lie down on that bed or I'll kill you.' That's not the only way [to create] duress. Duress can be, 'I'm an adult. I am physically larger than you. You are [seven years old] and a small child.' That implied threat of force doesn't have to be spoken. It's simply there, based on the physical size difference.

"It's also the fact these children were taught to respect [appellant], to follow what he said, and they knew if they disrespected an elder, they'd get in trouble. That's the duress with the [victims]. That hardship or retribution which will result if they don't listen to what their elder says and do what he says, and he knows that. *He doesn't have to even know it, though, it just has to be from the perspective of the child.* And [the victims] told you they did what he said because he was in that authority position, because he was that elder, they knew they had to respect [him] or else." (Italics added.)

Appellant contends this argument was legally incorrect because in order for there to be duress based on an implied threat, the defendant must be subjectively aware of the circumstances that created the threat. In other words, it's not enough that the victim may have submitted due to the defendant's age, size and authority; rather, the defendant

23

must have been aware of those circumstances and knowingly taken advantage of them to gain the victim's compliance.

We agree. In defending the prosecutor's remarks, respondent relies on the *Soto* case, in which the Supreme Court stated that duress is measured by an objective standard, without regard to how the victim perceived or reacted to the defendant's threats. (*Soto, supra*, 51 Cal.4th at p. 248.) However, the court did not say the defendant's awareness of the perceived threated was irrelevant. To the contrary, it defined duress as "us[ing] some form of psychological coercion to get someone else to do something[.]" (*Id*. at p. 243.) This suggests the defendant must be subjectively aware of the particular circumstances that are causing the victim to submit.

Nevertheless, it is exceedingly unlikely the prosecutor's remarks actually prejudiced the defendant. Even though the prosecutor said appellant's knowledge of the pertinent circumstances was not a necessary prerequisite to a finding of duress, she did not base her argument on that theoretical assumption. Instead, she repeatedly asserted that appellant *knowingly* took advantage of his age, size and status as an adult Vietnamese man to get the victims to comply with his sexual demands. And that's what the evidence proved as well. Because it is inconceivable appellant could have been ignorant of the circumstances that allegedly caused the victims to submit to his sexual misconduct, the prosecutor's isolated comments about that issue do not warrant reversal.

4. *Remaining Sufficiency of the Evidence Claims*

Appellant makes two more sufficiency-of-the-evidence arguments pertaining to the timing of certain alleged offenses and the quantum of evidence adduced at the preliminary hearing.

The claim about the timing of appellant's crimes is based on the prosecutor's closing argument that six of the crimes against Phi (counts 7-9 [forcible oral copulation] & counts 13-15 [forcible lewd touching]) occurred at the Schooner house, after Lieu moved there in early 2001. Working on the premise that the outer time frame

24

for the commission of those offenses was June 13, 2001, appellant contends there is insufficient evidence he molested Phi six times between early 2001 and that date.

However, as respondent correctly points out, the date of June 13, 2001 was the outer time frame alleged in the *original* information. During trial, the information was amended to conform to proof, and the outer frame for the commission of those six crimes was extended to June 13, 2003. Thus, the pertinent time frame for those offenses was 30 months, not 6. Based on Phi's testimony appellant touched her vagina on more than 10 occasions at the Schooner house, and he put his mouth on her vagina more than 4 times there, the jury could reasonably conclude appellant committed the 6 crimes that allegedly occurred at that location.

Appellant also argues he was improperly convicted of crimes that were not proven at the preliminary hearing. (See § 1009 [prohibiting the People from charging in the information any offense that was "not shown by the evidence taken at the preliminary examination."].) In so arguing, appellant focuses on Phi's testimony at the hearing about what happened to her at the Schooner house. He contends her testimony only supported two charges of molestation at that location, not six, but the record shows otherwise.

At the preliminary hearing, Phi testified appellant touched and licked her vagina at both the Foxdale apartment and the Schooner house. Regarding her abuse at the latter location, Phi said appellant would molest her on a bed while asking her questions about school and Disneyland. Phi also described an incident that occurred in the living room, when appellant grabbed her hand and placed it on his penis over his pants.

Appellant takes this to mean there were only two incidents of molestation involving Phi at the Schooner house, one on the bed, and one on the living room. However, it was clear from Phi's preliminary hearing testimony that those were not isolated events. She said she went over to the Schooner house virtually every Saturday to visit her cousins Thanh and Thuy. Although appellant wasn't at the house on all such

25

visits, Phi estimated he was there on about half of them. And when he was at the house with Phi, he would usually molest her. Phi also testified the molestation continued until she was in the sixth grade, which was about two years after Lieu moved into the house.

Because Phi's preliminary hearing testimony established appellant molested her on an ongoing basis at the Schooner house, the prosecution was not limited to charging him with committing just two crimes against Phi at that location. Rather, the evidence fully supported all six of the charges that were alleged in the information. Appellant has no basis to complain he was not afforded proper notice of those charges by evidence shown at the preliminary hearing.

Appellant also contends all eight of his convictions for aggravated sexual assault based on forcible oral copulation must be set aside because the preliminary hearing judge did not bind him over for trial on that offense.[9] However, the prosecution is not prohibited from charging crimes for which the defendant was not held to answer at the preliminary hearing. To the contrary, the prosecution may charge the defendant with any offense shown by the evidence at the hearing, unless the hearing judge made factual findings that preclude the charge. (§ 739; *Jones v. Superior Court* (1971) 4 Cal.3d 660, 664-666; *People v. Manning* (1982) 133 Cal.App.3d 159, 165.)

During her preliminary hearing testimony, Phi said that in addition to orally copulating her more than a dozen times at the Foxdale apartment, appellant continued to abuse her in that fashion for two more years at the Schooner house. Thanh also described two specific acts of oral copulation that appellant forced her to endure. Because the preliminary hearing judge did not make any factual findings to the contrary, this evidence was sufficient to support the prosecution's decision to charge appellant with eight counts of aggravated sexual assault. We see no reason to disturb appellant's convictions on those, or any other counts, for lack of evidentiary support.

---

[9] The amended complaint charged appellant with one count of aggravated sexual assault, but the judge bound appellant over on the lesser included offense of oral copulation.

26

C. *Prosecutorial Misconduct Claims*

Appellant also contends the prosecutor engaged in serious and pervasive misconduct during the course of the trial. His allegations fall into two basic categories: Complaints about the manner in which the prosecutor questioned him on cross-examination, and complaints about the manner in which the prosecutor argued her case to the jury in closing argument. There is also one complaint that the prosecutor improperly elicited testimony about appellant's possible punishment. Even though defense counsel did not object to every instance of alleged misconduct, thus raising the specter of forfeiture (see *People v. Brown* (2003) 31 Cal.4th 518, 553), we will address them all, in light of appellant's fallback argument that any inexcusable failure to object constituted ineffective assistance of counsel.

1. *General Principles*

A prosecutor's primary responsibility is to ensure the defendant receives a fair trial. (*People v. Force* (2019) 39 Cal.App.5th 506, 508.) That doesn't mean the state's attorney must try his or her case with "'"Chesterfieldian politeness."' [Citation.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.) To the contrary, the adversarial nature of criminal trials dictates prosecutors pursue their cause with vigor and zeal. Although fraudulent or misleading tactics are obviously not allowed, prosecutors have wide latitude in terms of arguing and presenting their case to the jury. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.) We will not reverse a conviction for alleged misconduct unless the prosecutor's tactics involved "deceptive or reprehensible methods of persuasion" or they "'infect[ed] the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 444.)

2. *Appellant's Cross-Examination*

a. *Asking About the Victims' Truthfulness*

Throughout his testimony, appellant insisted he never mistreated the victims in any way. That prompted the prosecutor to ask him if the victims were just

"making up" their accusations, and he said they were. Although it is hard to see how this exchange was prejudicial to appellant, he contends it was argumentative and violated the trial court's pretrial directive that the attorneys refrain from asking one witness about the credibility of another witness. However, that directive was meant to apply to the questioning of witnesses who lacked personal information about the truth of the charges, such as parents, counselors and police officers. Because appellant was uniquely positioned to know if the victims were telling the truth, because he could well have responded that he thought they had misunderstood innocent acts or provided some other explanation than out-and-out prevarication, the challenged question was not improper. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 319; *People v. Chatman* (2006) 38 Cal.4th 344, 384.)

### b. *Asking About Appellant's Trial Prep*

After appellant admitted having read the police reports and other investigative materials pertaining to the case, the prosecutor asked him, "And you've been thinking for months about what you were going to try to tell this jury to get out of this; right?" When appellant answered no, the prosecutor asked him, "And you expect them to believe that?" Appellant contends this question was not only argumentative, but by asking him if he was trying "to get out of this," the prosecutor impermissibly implied he had the burden of proof to prove he was not guilty. However, the trial court sustained defense counsel's objection to the question, and the jurors were told they *must* ignore all questions that drew successful objections. Considering this admonishment, and given that both the court and the parties repeatedly informed the jury the prosecution had the burden to prove appellant's guilt beyond a reasonable doubt, the challenged question did not create reversible error.

### c. *Asking About Appellant's Work Schedule*

During his testimony, appellant insisted he could not have committed the charged offenses because he always had to work on the weekends, which is when most of

28

the molestation allegedly occurred. However, appellant's own witnesses testified they sometimes saw him at family gatherings on the weekend. When asked how that was possible, appellant said he did not know, to which the prosecutor responded, "You either worked every weekend . . . or you didn't."

Although defense counsel's argumentative objection was overruled, appellant contends this question, if it can properly be characterized as such, was improper because the prosecutor was trying to engage him in argument rather than elicit facts within his personal knowledge. Appellant's work schedule *was* within his personal knowledge, however. And rather than taking the prosecutor's bait and arguing with her over the issue, appellant used the opportunity to clarify that while he did work regularly on the weekends, he sometimes finished early enough to attend the tail end of family gatherings. We fail to see how this exchange rendered appellant's trial unfair.

As appellant notes, the prosecutor followed up this exchange by asking him why none of the other witnesses testified they ever saw him at the tail end of family gatherings. Appellant claims those questions were improper because they were argumentative and called on him to speculate about what other witnesses knew or saw. He's right about the speculation part, which is why the trial court sustained his objection on that ground. However, since appellant had personal knowledge about when he worked, it was entirely permissible for the prosecutor to make the broader point that his testimony on that topic appeared to be at odds with the testimony provided by other witnesses. The prosecutor's questioning in this area did not rise to the level of reversal misconduct.

d. *Asking About Tran's Age*

Tran testified she met and started dating appellant in 1993, when she was 16 years old. However, when the prosecutor asked appellant about this, he said he did not know how old Tran was when they started dating. While appellant admitted he knew Tran was in high school, he claimed, "I wasn't paying attention to her age." Finding that

29

hard to believe, the prosecutor retorted, "And you expect the jury to believe that?"[10] Before appellant could answer, the trial court sustained defense counsel's objection that the question was argumentative. So even though the question was improper, it could not have harmed appellant. As noted above, the jury was instructed to ignore any question that drew a successful objection, and there being no indication otherwise, we presume the jury heeded this admonishment. (*People v. Burgener* (2003) 29 Cal.4th 833, 874.)

e. *Asking About How Often Appellant Saw Thanh*

On direct examination, appellant testified there were many occasions on which Lieu badmouthed him in front of Thanh at the Foxdale apartment. But on cross-examination, he insisted he only saw Thanh at the apartment a few times. Struck by this inconsistency, the prosecutor told appellant that it was "funny," (meaning suspicious) that he was trying to change his testimony on this point. After reminding appellant about his direct testimony, the prosecutor then said, "So that means, when I asked you, 'Didn't you see Thanh at Foxdale many times?' The correct answer is 'Yes?'" When defense counsel objected to the question as argumentative, the court directed the prosecutor to rephrase the question, which she did. Eventually, appellant told the jury that he did not keep track of the number of times he saw Thanh at the Foxdale apartment. All he knew was that sometimes she was there when he visited the apartment, and sometimes she wasn't.

Appellant would have us believe that besides being argumentative, this line of questioning suggested the prosecutor had special knowledge about the case and was somehow vouching for the victim's credibility by "manufactur[ing] evidence of guilt." This is a stretch. Viewed in context, the jury would have understood the prosecutor was simply trying to highlight a perceived inconsistency in appellant's own testimony. This did not constitute misconduct in any sense of the word.

---

[10] This is a question the prosecutor should delete from her repertoire; we're surprised to see a felony-level prosecutor who has not already done that.

30

f. *Asking About Tran's Cancer*

Tran testified that since her serious brush with cancer in 2011, her test results have all been good, and the only reason she has had to go back to the hospital is for annual checkups. Similarly, Stella testified Tran's cancer has been in remission since 2011. However, appellant testified that Tran had a serious relapse in 2014. He said that when he visited her in the hospital at that time, she reiterated her desire that she wanted him to raise their daughter Stella if anything happened to her. Of course, this was right around the time Thanh first reported appellant to the police. The defense theorized Thanh did so in an attempt to remove appellant as an obstacle to Lieu obtaining custody of Stella if Tran did not survive her relapse.

So, during appellant's cross-examination, the prosecutor attempted to cast doubt on appellant's assertion that Tran had a cancer relapse in 2104. She did so by alluding to the testimony of appellant's sisters, Jenny and Christina, both of whom testified that they visited Tran in 2011 when she first took ill with cancer. The prosecutor first asked appellant, "Your sister Jenny said nothing about 2014; right?" After defense counsel's hearsay objection was overruled, appellant answered no. The prosecutor then asked appellant, "Your sister Christina said nothing about visiting Tran in a hospital in 2014; right?" Appellant acknowledged that was correct. The prosecutor also asked appellant if he heard Stella testify that Tran has been in remission since 2011. Appellant said he could not remember her doing so.

Appellant contends these questions implicated the hearsay rule because they repeated, or at least invoked, the testimony of another witness. However, all of the subject witnesses testified at trial and underwent cross-examination. Therefore, the prosecutor's questions did not run afoul of the hearsay rule. (See Evid. Code, § 1200, subd. (a) [defining hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing"].)

31

Appellant also argues the questions put to appellant about Jenny and Christina's testimony were irrelevant. That's true. If, like Stella, Jenny and Christina had testified Tran was cancer-free in 2014, their testimony would have been probative in terms of disproving appellant's claim to the contrary. But during their testimony, Jenny and Christina were never asked about the state of Tran's cancer at that time. Therefore, it meant little that they never actually said anything about Tran being sick in 2014 or visiting her that time. Raising this aspect of their testimony to appellant was a singularly ineffective way of impeaching him, given the limited scope of their testimony.

But that is precisely why these questions were not prejudicial to appellant. Since Jenny and Christina's testimony did not actually provide fodder for appellant's impeachment, it is highly unlikely the jury was misled or prejudiced by this line of questioning. It is therefore not cause for reversal.

g. *Asking About the Victims' State of Mind*

Appellant asserts the prosecutor erred by asking him questions about what motivated Thanh and Phi to accuse him of molesting them, and why Phi's mother Trang never seemed to like him. In appellant's view, these questions called for speculation and constituted improper lay opinion. However, the record shows this testimony was only given in response to testimony by appellant.

When asked if he ever gave Thanh, Phi or Trang a reason to be upset with him, appellant said they didn't like him because they were beholden to Lieu, and Lieu often badmouthed him in their company. In other words, appellant claimed they disliked him because they were negatively influenced by Lieu. Based on those answers, the prosecutor then asked appellant if that was why Thanh and Phi accused him of molesting them. Appellant answered, "I believe that was exactly the reason."

Technically speaking, the prosecutor's question called for speculation. But the question was a logical follow-up to appellant's testimony about why he thought the victims disliked him. While we consider the phrase "opened the door" overused, this is

32

one of the instances in which it is accurately used. Moreover, these questions gave appellant a chance to tell the jury why, in his mind, the victims were out to get him, which was a big part of his defense strategy. Since appellant's testimony about the victims' motivation for accusing him fully comported with his theory of the case, it could not have prejudiced him in any meaningful way.

### 3. *Closing Argument*

We now turn to appellant's contention the prosecutor committed multiple instances of misconduct during her closing argument.

### a. *Commenting About Appellant's Character Witnesses*

Before trial, the prosecutor expressed concern about the number of character witnesses appellant intended to call and the scope of their testimony. At a pretrial hearing on the issue, defense counsel told the court he intended to call nine character witnesses from appellant's side of the family. Although the court did not expect that to be a problem, it said it was going to "wait and see" how the issue played out at trial before making any rulings on the matter.

As it turned out, defense counsel ended up calling only five character witnesses on appellant's behalf. The prosecutor did not object to their testifying or make any attempt to prevent defense counsel from calling additional character witnesses. However, in her closing argument, the prosecutor did address the character witnesses that were called, saying:

"[The defense] also brought in some of [appellant's] female relatives to say that he never molested them. I think there were four or five. He never molested his biological daughter, and he never molested the cousins that he saw only at large family events. [¶] He's not attracted to his blood relatives. Instead, he chose to abuse the girls that he's related to by marriage, to whom he had access in private at [Lieu's] home . . . . Not every child is molested by a child molester. They pick their targets and he picked Thanh, Thuy and Phi."

33

Appellant claims this argument was misleading because it implied the only people he could get to vouch for his character were his relatives, when in fact, the prosecutor knew that was not the case.[11]  (See *People v. Zaheer* (2020) 54 Cal.App.5th 326, 338-339 [a prosecutor is not allowed to make statements to the jury that she knows to be false or has a very strong reason to doubt].)  However, the prosecutor's argument did not suggest anything about appellant's ability to secure character witnesses on his behalf.  She merely argued appellant had no interest in molesting his relatives because he was sexually attracted to, and had private access to, his cousins-in-law.  There was nothing improper about this argument.

### b. *The Burden of Proof*

Relying on *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*), appellant contends the prosecutor repeatedly misstated the burden of proof in explaining the concept of reasonable doubt to the jury.  In *Centeno*, the Supreme Court found the prosecutor's comments impermissibly "confounded the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt."  (*Id*. at p. 673.)  The problem was, "the prosecutor did not simply urge the jury to '"accept the reasonable and reject the unreasonable"' in evaluating the evidence before it."  (*Ibid*.)  Rather, the prosecutor "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence[,]" which impermissibly diluted the prosecution's burden of proof.  (*Ibid*.)  At one point during her closing argument, the prosecutor even told the jurors they could convict the defendant if they reasonably believed he was guilty of the charged offense.  (*Id*. at pp. 671–672.)

In this case, the prosecutor readily acknowledged at the outset of her closing argument that she had the burden of proving *all* the elements of the charged

---

[11]  According to appellant, the prosecutor was made aware through discovery that one of his neighbors, a nonrelative, was willing to testify as a character witness on his behalf.  Respondent does not dispute this.

offenses beyond a reasonable doubt. She then attempted to explain what reasonable doubt means, telling the jury "it's an abiding conviction that the charge is true. It's not beyond all doubt. It's not beyond any doubt. It's a reasonable doubt, because everything in life is open to some possible or imaginary doubt. *It's what's reasonable based on your common sense*." (Italics added.)

Respondent concedes the italicized phrase is problematic to the extent it suggested a reasonableness standard governed the prosecution's burden of proof. But viewing the phrase in conjunction with the prosecutor's other remarks, it is apparent she was simply attempting to explain what the word "reasonable" means in the context of reasonable doubt. She did not conflate reasonable doubt with reasonableness, which is what the prosecutor did in *Centeno*.

A short while later, the prosecutor told the jury, "Now, the defense doesn't have to put on a case. They don't have a *burden*, I do. But when they put on evidence, that evidence is subject to the same standards as the evidence that I put on. *Common sense, reasonability, does it have the ring of truth[?]*" (Italics added.)

Appellant maintains that since the prosecutor referenced her "burden" in the first part of the paragraph, the jury would have believed she was alluding to the burden of proof when she later referenced the concepts of "common sense" and "reasonability." However, when the prosecutor referenced those concepts, she was talking about the general principles applicable to determining the reliability of evidence, not the burden of proof. Her remarks were not misleading.

The third instance of alleged *Centeno* error occurred at the end of the prosecutor's opening argument, when she said, "The judge told you that when you consider the circumstantial evidence, you accept the reasonable conclusions and reject any that are unreasonable. The only reasonable conclusion from the evidence you heard last week is that the defendant is guilty on all the counts that we've alleged. That's why I'm here now to ask you to vote guilty on all of the counts."

Respondent concedes this argument improperly conflated the concept of rejecting unreasonable inferences with the standard of proof applicable to deciding whether appellant was guilty of the charged offenses, i.e., proof beyond a reasonable doubt.  We will assess the prejudicial impact of this statement after reviewing the last claimed instance of *Centeno* error, which occurred during the prosecutor's rebuttal argument.

During rebuttal, the prosecutor argued that even if it were true that Lieu badmouthed appellant in front of Thanh when she was a child, that would not cause Thanh to falsely accuse appellant of molesting her many years later, when she was an adult.  Finishing this thought, the prosecutor said, "Common sense, reasonableness – that's ridiculous."

It's hard to see how this comment violated *Centeno* because the prosecutor was discussing a perceived weakness in appellant's defense theory, not the burden of proof required to find him guilty.  Arguably, the single reference to "reasonableness" harkened back to the burden of proof and improperly suggested mere reasonableness was the standard for finding appellant guilty.  However, in determining whether *Centeno* error occurred, we ""do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citations.]" (*Centeno, supra*, 60 Cal.4th at p. 667.)

Moreover, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. . . ." (*Centeno, supra*, 60 Cal.4th at p. 667.)

Appellant has not shown such a likelihood in this case.  Even though the prosecutor commingled the concept of reasonable inferences and reasonable doubt at a few points during her extended argument, she also repeatedly reminded the jury that she

36

had the burden of proving appellant's guilt beyond a reasonable doubt. So did defense counsel in his closing argument. In fact, upon taking to the podium, the very first thing he did during closing argument was launch into an extended discussion about the presumption of innocence and the prosecution's burden of proof. And, of course, the trial court instructed the jury extensively on these important concepts as well.

The court also told the jurors it was the final arbiter on all legal issues. Thus, if the attorneys said anything that conflicted with its instructions on the law, they must follow the court's instructions. (See CALCRIM No. 200.) Given everything the jurors were told, it is not reasonably likely the prosecutor's complained-of remarks corrupted their understanding of the burden of proof. Consequently, they do not warrant reversal.

### c. *Misstatements of Fact*

Appellant also accuses the prosecutor of misstating the facts in closing argument by telling the jury that none of the victims ever heard Lieu badmouth appellant when they were growing up. As to that issue, the prosecutor asserted, "Thanh, Thuy, Phi, they all came in here and they were all asked, 'Did you hear Lieu . . . say that [appellant] was an idiot or that he was worthless, that he didn't make enough money?' None of them heard that. The only people who testified to that [were appellant] . . . his sister . . . and his best friend, that's it."

Appellant contends this was factually incorrect because although Thanh testified that she never heard Lieu call appellant any bad names, she did hear Lieu say that appellant was unfaithful to Tran and that Tran could have done better than appellant in terms of finding a husband. But the prosecutor's remarks did not mention those specific subjects; all she said is that Thanh never heard Lieu say appellant was an idiot, worthless or did not make enough money. So, technically speaking, the prosecutor's remarks were accurate.

37

Even if they mischaracterized the spirt of Thanh's testimony, the jurors were instructed that statements made by counsel, including those made in closing argument, are not evidence, and it was up to them, and them alone, to decide what the facts are. Since there is nothing in the record indicating otherwise, we presume the jury followed theses admonishments. (*People v. Edwards* (2013) 57 Cal.4th 658, 764; *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

#### d. *Appeal for Sympathy*

The jury was also instructed to not let bias, sympathy or prejudice influence its decision. Appellant claims the prosecutor undermined this instruction by arguing to the jury that Phi and Thanh had better things to do than to come into court and "relieve their memories" and answer "graphic sexual questions" about the abuse they suffered when they were children. However, those comments were not intended to garner sympathy for Phi and Thanh, they were intended to impress upon the jury that Phi and Thanh were telling the truth about what appellant did to them. The prosecutor was merely trying to make the point that Phi and Thanh were believable because they had nothing to gain from subjecting themselves to the ordeal of testifying in open court about uncomfortable matters that they would rather put behind them. The subject remarks were not improper.

#### 4. *Eliciting Testimony on the Issue of Punishment*

In addition to accusing the prosecutor of misconduct during cross-examination and closing argument, appellant contends she elicited improper testimony from Investigator Wharton, who, as explained above, came onto the case in relief of investigators from the SJPD. Appellant fears Wharton's testimony may have misled the jury into thinking the alleged offenses were not very serious and that he was not facing the prospect of a substantial prison sentence, and therefore it would be no big deal to convict him. However, we do not believe it is reasonably likely the jury construed Wharton's testimony in that fashion.

Wharton testified the reason he got involved in the case is because the sex crimes division of the SJPD simply has too few investigators to handle all of the cases that come in. Since Wharton had worked in that division for many years, the prosecutor asked him how those cases are prioritized, and he said the most serious cases take the highest priority. He then explained that those are the cases where the offender is likely to prey on new victims, or "the offender would be looking at a very long sentence if they were convicted." Wharton was then asked about cases where the offender had current access to the victim. Asked if those cases received the "highest priority," he replied, "Yes, absolutely . . . . We'll actually come in on off hours to work those cases immediately."

This testimony was used to explain why it took the SJPD nearly two years to follow up on Thanh's initial accusations against appellant. Based on Wharton's testimony, it was obvious the department's sex crimes investigators were extremely busy at that time. And it was equally apparent that Thanh's case was not a top priority because it had been many years since appellant had molested her. The timing of her complaint simply did not warrant immediate attention, given the pressing demands of the department.

To our understanding, that was the main takeaway from Wharton's testimony. While Wharton also stated that priority is given to cases where the offender is facing a long prison sentence, we do not think it is reasonably likely the jurors would have construed that to mean appellant's case was not serious, or he was not facing the prospect of a long prison sentence. After all, he was charged with 18 felonies for engaging in serious sexual misconduct with 3 young girls. Despite Wharton's testimony about the priority of sex crime cases, no reasonable juror would believe appellant would be getting off easy for such egregious behavior. (See generally *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 [recognizing the "sexual abuse of a child is a most

39

serious crime and an act repugnant to the moral instincts of a decent people"].) The prosecutor did not err in eliciting this testimony.

### D. *Uncharged Misconduct Evidence*

Appellant asserts the trial court abused its discretion in admitting Phoung's testimony that appellant once picked her up by her breasts at the Foxdale apartment when she was in the ninth grade. Appellant contends this uncharged incident had no bearing on his propensity to commit the charged offenses, but we disagree and uphold the trial court's decision to allow it into evidence.[12]

Evidence of the defendant's uncharged misconduct is generally not admissible to prove his conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, evidence of prior sex crimes is treated differently. Pursuant to Evidence Code section 1108, such evidence is admissible to prove the defendant's propensity for sexual misconduct in a sex crimes prosecution, so long as it is not unduly prejudicial within the meaning of section 352. (Evid. Code, § 1108, subd. (a).)

Evidence Code section 352 empowers trial courts to exclude evidence if its probative value is substantially outweighed by the probability its admission would cause undue delay, confusion, or prejudice. For purposes of this section, *prejudicial* evidence is not synonymous with *damaging* evidence; rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant and has very little relevance to the issues presented in the trial. (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

In this case, the evidence of appellant's sexual misconduct with Phoung was not confusing or time consuming. And, it occurred at the same location where, and during the same time period when, many of the charged offenses allegedly occurred. The

---

[12] Although appellant acquiesced to Phoung's testimony about this incident at trial, we will review his challenge to it on appeal because he contends his trial attorney mishandled the issue below. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [addressing forfeited issue "to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].) We note the trial court also admitted the Reno hotel incident involving Thanh as uncharged propensity evidence, but appellant does not challenge that evidence on appeal.

incident with Phoung was also relatively benign compared to what appellant was accused of doing to the named victims. These factors lessened the prejudicial impact of Phoung's testimony. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 205; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

Nonetheless, appellant contends the incident involving Phoung was so dissimilar to the charged offenses as to have no probative value whatsoever. Granted, Phoung was a few years older at the time appellant molested her, as compared to the named victims. And the nature of her victimization (breast grabbing) was different from what the named victims endured (genital touching, oral copulation and tongue sucking). However, similarity between the uncharged and charged sex crimes is not a requirement under Evidence Code section 1108. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41.) In fact, courts have recognized that imposing a similarity requirement would undermine the purpose of the statute and ignore the fact many sex offenders are not specialists in terms of the crimes they commit. (*People v. Soto* (1998) 64 Cal.App.4th 966, 984.) We are satisfied the circumstances and timing of Phoung's victimization were similar enough to the victims' abuse to justify the admission of Phoung's testimony. (Compare *People v. Jandres* (2014) 226 Cal.App.4th 340, 355-357 [evidence the defendant had previously put his finger in the mouth of an 11-year-old-girl was not probative of whether he forcibly raped an adult woman]; *People v. Earle* (2009) 172 Cal.App.4th 372, 398 [questioning whether the defendant's act of indecent exposure was relevant to prove he had a propensity to commit rape]; *People v. Harris* (1998) 60 Cal.App.4th 727, 738-741 [evidence regarding the defendant's prior sex offense should have been excluded because it was much more inflammatory and violent than the charged sex crimes].)

In a related claim, appellant contends the trial court erred in instructing the jury with regard to the uncharged incident involving Phoung. Respondent concedes the error but claims it was not prejudicial. We agree with respondent on this point.

41

When evidence of an uncharged sex offense is admitted in a sex crimes prosecution, the trial court must identify and instruct on the uncharged offense. (See *People v. Jandres, supra*, 226 Cal.App.4th at p. 358.) Here, the trial court identified the uncharged offense as a violation of section 288, subdivisions (a) or (b)(1), which pertain to lewd and forcible lewd acts on a person under the age of 14. However, Phoung testified that she was already 14 years old at the time appellant picked her up by her breasts. Therefore, the crime amounted to a violation of section 288, subdivision (c), which proscribes lewd conduct with "a child of 14 or 15 years," not subdivisions (a) or (b)(1).

Nevertheless, this mistake could only have inured to the benefit of appellant. Since the jury was told it had to find the uncharged offense involved the molestation of a person under the age of 14 before it could use that offense for propensity purposes, the court's miscue effectively precluded the jury from considering the Phoung incident for this purpose. That being the case, the miscue was, at most, harmless error.

E. *Alleged Ineffective Assistance of Counsel*

Appellant avers his trial attorney was ineffective for failing to present additional evidence on his behalf. However, even if defense counsel was remiss in this regard, appellant has failed to prove he was prejudiced by this failing. Therefore, his Sixth Amendment right to effective assistance of counsel was not infringed.

A defendant alleging ineffective assistance of counsel "must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845, citing *Strickland v. Washington* (1984) 466 U.S. 668.) The prejudice prong of this standard is often determinative; if prejudice is lacking,

42

inquiry into the deficiency prong is not required. (*Strickland v. Washington, supra*, 466 U.S. at p. 697.) Such is the case here.

Appellant faults his attorney in three respects. One, for failing to present additional evidence to support his claim about visiting Tran in the hospital in 2014 when her cancer supposedly returned. Two, for failing to call any character witnesses to whom he is not related. And three, for failing to introduce a purported statement in which he proclaimed his innocence at or near the time of his arrest. But none of this evidence would have directly refuted the victims' allegations or meaningfully enhanced appellant's defense. In fact, the cancer issue was a complete nonstarter for appellant because Tran herself testified she has been cancer-free since her treatment in 2011.

And while the failure to call a particular type of character witness could conceivably make a difference in a close case, this was not such a case. It took the jury a mere four hours to reach a verdict after hearing appellant testify and listening to a parade of witnesses vouch for his character. Adding another character witness to the list would not have helped appellant's cause, even if that witness was a nonrelative, and even if the jury knew appellant had asserted his innocence at or near the time of his arrest. Because it is not reasonably probable appellant would have obtained a more favorable result had the jury heard this evidence, we reject his Sixth Amendment claim.

## F. *Cumulative Error*

Lastly, appellant contends the cumulative effect of all the errors committed by the trial court, the prosecutor and his own attorney compels reversal. However, the few errors that did occur did not render appellant's trial fundamentally unfair in violation of due process. Whether considered individually, or in combination with one another, those errors do not warrant a reversal of the judgment.

43

## IV. DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.